IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                              *
DAWN M. AUFFARTH,
                              *
     Plaintiff,               *
                              *
          v.                              CIVIL NO.: WDQ-08-1399
                              *
NATIONWIDE MUTUAL INSURANCE    *
COMPANY,
                              *
     Defendant.               *
```

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Dawn M. Auffarth sued Nationwide Mutual Insurance Company
for a declaratory judgment, breach of contract, and other
claims. Nationwide counterclaimed for breach of contract. For
the following reasons, Nationwide's motion for summary judgment
on Auffarth's claims will be granted, and its motion for summary
judgment on its counterclaim will be granted in part.
Auffarth's motions will be denied.

I.  Background[1]

Auffarth is a Nationwide insurance agent with an office in Phoenix, Maryland.  *See* Auffarth Opp., Ex. 10.  Under a June 29, 2009 "Replacement Agency Executive Performance Agreement" ("RAE") Nationwide assigned Auffarth the rights to service the policies of retiring Nationwide agents Beth Graham and Richard Siejack.  Nationwide Mot. for Summ. J., Ex. 1 [hereinafter "RAE"].  The RAE required Auffarth to pay $276,940.00 for the assigned policies.[2]  RAE Arts. 2, 3, 5, 7.

The payment was to be made in two installments.  The "First Payment" of 100 percent of the Income ($184,627) was due "within ten (10) days following the six (6) month anniversary of the effective date of [the RAE]," *i.e.*, October 10, 2005.  *Id.*, Art.

---

[1] On cross-motions for summary judgment, the Court must "review each motion separately . . . [and] resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing the motion."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal citations and quotation marks omitted).

[2] This amount was calculated by a formula in Article 5 of the RAE, under which "[Auffarth] and Nationwide expressly agree[d] that the value of assigning these policies to [Auffarth] [was] one hundred fifty percent (150%) of the Income."  *Id.*, Art. 5. The "Income" represented "[n]inety-five percent (95%) of the renewal service fee income attributable to the property/casualty ("P&C") business assigned to [Auffarth] in the twelve (12) months immediately preceding the effective date of the [the RAE], adjusted as solely determined by Nationwide."  *Id.*, Art. 1.

5.[3]  The "Second Payment"--50 percent of the Income, or $92,313--was due "by the end of the 25th full calendar month following the effective date [the RAE]," *i.e.*, May 31, 2007.  *Id*.

The RAE permitted Auffarth to rescind--and avoid all payment obligations--by notifying Nationwide in writing within six months of the effective date.  *Id*.  The RAE also stated two ways in which the purchase price could be adjusted.  Under Article 5, "[p]ayment amounts . . . [could] be adjusted and reduced if, during the first twelve (12) months following the effective date of this Agreement, 5% or more of the direct written premium . . . from the Nationwide commercial lines policies assigned to [Auffarth] from the former agent [was] non-renewed by Nationwide."  *Id*.[4]  Article 6 contained several "waiver options" under which "[u]p to one hundred percent (100%) of the Second Payment [could] be waived by Nationwide if certain requirements [were] met" by Auffarth.  *Id.*, Art. 6.[5]  The RAE

---

[3] The effective date of the RAE was April 1, 2005.  *Id.*, Art. 2.

[4] If Nationwide decided not to renew expired policies of commercial clients, and the premiums of those "non-renewals" were five percent or more of the total premiums of the commercial policies Auffarth was assigned, the purchase price could be adjusted accordingly.

[5] For example, under "Waiver Option 1," Nationwide agreed to waive 50 percent of the Second Payment if Auffarth (1) "increase[d] the [direct written premiums] of the assigned policies at a rate equal to the annual State Growth Objectives" and (2) produced an additional $356,534 in premiums.  "Waiver

required all waivers to be "in writing and signed by the party claimed to have waived." *Id.*, Art. 15.

The RAE also stated that it would "continue until [Auffarth] satisfie[d] the Second Payment requirement" and that "[e]xcept as otherwise indicated . . . , in the event of cancellation or termination of [the RAE] . . . [Auffarth] remain[ed] responsible for any financial obligation [she] incurred in relation to [the RAE]." *Id.*, Art. 2; *see also id.*, Art. 14 ("The obligations of the parties under this Agreement that by their nature continue beyond the expiration of the Agreement shall survive any termination or cancellation of this Agreement."). Finally, the RAE stated that "[i]n addition to all other remedies that it may pursue, Nationwide shall have the right to recapture any amount due to Nationwide from any future compensation due to [Auffarth]." RAE, Art. 12.

On October 10, 2005--the due date for the First Payment--a Nationwide representative emailed Auffarth:

> Our records indicate that you have been servicing the policies formerly serviced by K. Graham for a number of months. It is now time for you to decide if you

---

Option 2" provided a 50 percent reduction in the Second Payment if "[Auffarth] participate[d] in the Choice Plus Program at the end of the 24th month following the effective date of [the RAE]." Auffarth was also eligible for a 100 percent waiver of the Second Payment if she satisfied Waiver Option 1 and produced $605,860 in additional premiums. *Id.*

4

want to purchase the servicing rights.  Please
complete one of the following steps:

If you plan to retain the servicing rights and opted
to finance through the NFCU[6] (and you have been pre-
approved), NFCU will be in contact to secure your
signature on the loan documents.

....

If you plan to retain the servicing rights and opted
for outside financing then you are requested to remit
the first payment in full to Nationwide Insurance . .
. . The amount due is $184,627.

If you decide you do not want to retain the servicing
rights, please reply to this email stating your
decision to return the policies no later than five (5)
days from the date of this letter.

If the loan documents are not secured or payment is
not remitted in full within 45 days of this reminder,
all future commission payments will be withheld and
applied to the outstanding amounts due.

Nationwide Mot. Summ. J., Ex. 5 (Email from Cathy K. Lantz to

Dawn Auffarth, Oct. 10, 2005).  Auffarth had planned to arrange

financing through Nationwide and had reached an agreement--in

principle--on a 12-year, 144-payment loan in the amount of the

First Payment.  *See* Auffarth Ans. to Interrog. No. 7, Jan. 29,

2009.

On October 7, 2005, Auffarth was informed by email that

Nationwide planned to "non-renew" a valuable commercial policy

(a so-called "habitational account") that she had been

---

[6] Nationwide Federal Credit Union.

servicing. *See* Auffarth Opp., Ex. 21 (Email from Tom Longshore

to Dawn Auffarth, Oct. 7, 2005).[7]  The email stated that

"Nationwide [was] taking a more aggressive posture on

habitational accounts . . . [because] it [had] been burned badly

by such risks." *Id*.  Because Auffarth stood to lose significant

premiums from this account, she requested that the price of the

assignments under the RAE be reduced.  *See* Auffarth Opp., Ex. 28

(Email from Dawn Auffarth to Nationwide Sales Manager Teresa

Dippel, Oct. 13, 2005).[8]  In her request to Dippel, Auffarth

explained that the "[s]ignature for [her] loan [was] due" and

that she wanted "an email confirming . . . adjustments to the

overall purchase price." *Id*.[9]  On October 21, 2005, Auffarth

learned that Nationwide planned to non-renew another valuable

---

[7] Nationwide has moved to strike several exhibits that Auffarth
attached to her Opposition on the grounds that they are hearsay
and have not been authenticated.  Auffarth has moved to file a
supplemental memorandum addressing this motion.  Because even
assuming the admissibility of the exhibits, Auffarth's motions
for summary judgment must be denied, the Court need not address
Nationwide's motion to strike or Auffarth's motion to file a
supplemental memorandum.  Accordingly, both motions will be
denied.

[8] The RAE permitted reduction of the purchase price if "during
the first twelve (12) months following the effective date of
[the RAE], 5% or more" of the premiums from the commercial
policies assigned were non-renewed by Nationwide.  RAE, Art. 5.

[9] The email from Auffarth to Dippel referred to Nationwide's
plans to non-renew two of Auffarth's commercial policies.  One
was United Presbyterian Westminster House; the other is not
identified, as Auffarth provides only the policy number.

commercial policy. *See id.*, Ex. 26-A (Email from Tom Longshore to Dawn Auffarth, Oct. 25, 2005).

In light of her uncertainty about these policies, Auffarth decided not to sign the Nationwide loan documents, but to await Nationwide's decision on her request to adjust the purchase price. Auffarth Ans. to Interrog. No. 7. While Auffarth was awaiting this decision, the Maryland Insurance Commission blocked Nationwide's attempt to non-renew the United Presbyterian policy. *See* Auffarth Opp., Ex. 23 (Email from Teresa Dippel to Dawn Auffarth, Mar. 13, 2006). Nationwide was similarly unsuccessful in its attempts to non-renew the other commercial policies. *See* Dawn M. Auffarth Dep. 55:11-57:25, Feb. 9, 2009. Nationwide did not act on Auffarth's request for adjustment. *See* Auffarth Opp., Ex. 33.[10]

On March 13, 2006, Dippel emailed Auffarth to inform her that Nationwide had decided not to adjust the price under the RAE. Auffarth Opp., Ex. 23 (Email from Teresa Dippel to Dawn Auffarth). Dippel noted that the RAE contemplated adjustment of the price "only if an account is company cancelled, the account

_____

[10] Auffarth's Exhibit 33 is an email from Todd Bevington, an employee in Nationwide's Agency Development Office, to Mark Jorgenson, another Nationwide employee. The email noted that given the length of the Maryland Insurance Commission process, if Nationwide prevailed and was able to non-renew the policy, the 12-month period under the RAE would have passed, and Auffarth's request would be moot.

represents more than 5% of the Commercial book and the agent has not been paid a commission." *Id.* She explained to Auffarth that these criteria had not been met. *Id.*[11]

Auffarth has testified that during the applicable 12-month period, none of her commercial policies was successfully non-renewed. Auffarth Dep. 55:11-57:25. However, she refused to pay the RAE purchase price after the 12-month period had expired. *See* Auffarth Opp., Ex. 29 (Email from John Mincy to Leslie Graden, Sept. 14, 2007). Despite her refusal, Nationwide did not reassign her policies, as it could have under the RAE. *See* RAE, Art. 5. Nationwide continued to support Auffarth, and anticipated that she would change from Replacement Agency Executive to a full-fledged Independent Contractor in mid-2007. *See* Auffarth Opp., Ex. 14 (Email from Bruce Datyone to Dawn Auffarth, Mar. 26, 2007). In late February of that year, Nationwide conducted an Independent Contractor Eligibility Audit of Auffarth's agency "to ensure that proper internal controls [were] in place and in accordance with the . . . Agency Manual." *Id.* The auditor made two recommendations--that Auffarth review

---

[11] It appears that two of the policies--United Presbyterian and St. Mary's Rolling View Towers--were eventually cancelled by the customers. *See* Auffarth Dep. 80:9-82:5. The cancellations occurred after the 12-month RAE period had run and/or Auffarth had been paid commission on the policies. *See id.* The third policy--N.M Carroll Manor--stayed with Nationwide, and Auffarth has continued to receive commissions from it. *Id.*

procedures for dealing with bad checks and keep a second copy of receipts--but did not raise her failure to make the payments required by the RAE. *See id.*

In March 2007, Nationwide offered to amend the RAE by reducing the purchase price to $273,443. Auffarth Opp., Ex. 11 [hereinafter "RAE Amendment"]. A condition of the RAE Amendment was that Auffarth agree to "waive[] all claims . . . against Nationwide . . . as of the date of the [RAE Amendment]." *Id.* Auffarth did not respond to the offer.

Notwithstanding her continuing failure to pay, Auffarth became an Independent Contractor in June 2007. *See id.*, Ex. 10 (Email from Tricia Caw to R.L. Morton, *et al.*, May 8, 2007). The email announcing the change stated that Auffarth had "completed [the] RAE program." *Id.* On the morning of the announcement, Dippel emailed Auffarth to ask if she would be "taking the revised purchase price [*i.e.*, the Amended RAE] or staying with [the RAE]." *Id.*, Ex. 10 (Email from Teresa Dippel to Dawn Auffarth, May 8, 2007). Auffarth replied, "I will be keeping the existing contract." *Id.* (Email from Dawn Auffarth to Teresa Dippel, May 8, 2007).

Around this time, Auffarth had called Nationwide's Agency Development department to ensure everything was in order for the change to Independent Contractor. Auffarth Dep. 97:20-98:13.

Auffarth has testified that she spoke to a person named Joy or
Julie, and asked if there were any remaining obligations under
the RAE. *Id.* 98:10-13. The person told Auffarth that there
was no "outstanding balance" and that all requirements under the
RAE had been satisfied. *Id.* Shortly thereafter, Auffarth spoke
to Dippel, who also stated that "she [had] looked at the sheets"
and there was no "outstanding balance," and that Auffarth had
successfully completed the RAE program. *Id.* 98:14-25. In
stating that Auffarth had no "outstanding balance," Dippel and
the unidentified person from Agency Development apparently
referred to a May 2007 spreadsheet, which stated that Auffarth's
"Total Loaned Amount" was $276,940.30 (*i.e.*, the RAE purchase
price) and her "Total Loan Balance" was zero. *See* Auffarth
Opp., Ex. 4.[12]

In late August or early September 2007, Dippel called
Auffarth about her failure to pay Nationwide. Auffarth Dep.
103:10-21. She told Auffarth that Agency Development was
"screwed up," and a number of people had failed to pay the
amounts due under agreements similar to the RAE. *Id.* 104:1-7.
She also said that Nationwide would be issuing a letter
demanding repayment within 30 days. *Id.* In October 2007,

---

[12] Auffarth had not taken a loan from Nationwide; she had refused
to sign the loan documents when concerns arose about certain
commercial policies.

Auffarth met with Dippel and James Holkamp, another Nationwide manager, to discuss her debt. *Id.* 105:1-22. Auffarth told them that she would pay "whatever [she was] legally obligated to pay." *Id.* No payment was forthcoming. In May 2008, Nationwide demanded that Auffarth pay the amount due under the RAE. Nationwide Mot. Summ. J., Ex. 6 (Letter from John Mincy to Dawn Auffarth, undated). The demand letter was captioned as a "final notice" and stated that if Auffarth failed to pay, Nationwide would "initiate a three-year . . . commission deduction plan to obtain payment for this past due obligation pursuant to the terms of your Merger and/or RAE Agreement." *Id.*[13] Each deduction would be $4,269.99. *Id.* Auffarth refused to pay, and Nationwide began deductions.

On May 21, 2008, Auffarth sued Nationwide in the Circuit Court for Baltimore City for a declaratory judgment,[14] breach of contract, tortious interference, unfair competition, misrepresentation, negligent misrepresentation, breach of fiduciary duty, negligent advice, and unjust enrichment. *Id.* On May 30, 2008, Nationwide removed to this Court on the basis

---

[13] The RAE stated that "[i]n addition to all other remedies that it may pursue, Nationwide shall have the right to recapture any amount due to Nationwide from any future compensation due to [Auffarth]." RAE, Art. 12.

[14] Auffarth sought a declaratory judgment that Nationwide was in breach of contract.

of diversity.  Paper No. 1.  On July 2, 2008, Nationwide counterclaimed for breach of contract.  Paper No. 11.  The Court denied Auffarth's motion to remand on July 24, 2008 and dismissed all but her claims for declaratory judgment and breach of contract on September 19, 2008.  Paper No. 28.

On February 1, 2010, Nationwide moved for summary judgment on Auffarth's declaratory judgment and breach of contract claims and on its counterclaim.  Paper No. 51.  Auffarth filed a cross-motion for summary judgment on its claims and Nationwide's counterclaim.  Paper No. 55.  On April 9, 2010, Auffarth moved to file a supplemental memorandum in support of her motions. Paper No. 66.

II.  Analysis

A.  Standard of Review

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

B. Nationwide's Motion for Summary Judgment on its
Counterclaim[15]

---

[15] Although there are four motions for summary judgment pending--cross-motions on Auffarth's claims and Nationwide's counterclaim--the parties have not argued them separately, but have treated them as raising a single question: is Auffarth liable for breach of contract?  Auffarth's complaint essentially alleges that Nationwide breached the RAE by wrongfully deducting amounts it believed were due under the RAE from her commissions— *i.e.*, Auffarth's claims presuppose that Auffarth did not breach the RAE, which allowed Nationwide to "recapture any amount due to Nationwide from any compensation due to [Auffarth]" in the event of breach.  *See* RAE, Art. 12.  If Auffarth is liable to Nationwide on its counterclaim for breach of the RAE, her claims against Nationwide necessarily fail.

Because the Court will hold that Nationwide is entitled to summary judgment on its counterclaim, Nationwide is necessarily also entitled to summary judgment on Auffarth's claims for declaratory judgment and breach of contract.  Auffarth's cross-motion for summary judgment on those claims will be denied.

13

Nationwide contends that by failing to pay for the assignments, Auffarth breached the RAE. Auffarth counters that Nationwide failed to assign her all the policies referenced in the RAE and has waived its right to payment. To establish a breach of contract under Ohio law,[16] "a plaintiff must show that [1] a contract existed, [2], the plaintiff performed, [3] the defendant breached, and [4] the plaintiff suffered damages." *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (*citing Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 807 N.E.2d 953, 957 (Ohio Ct. App. 2004).

### 1. Existence of the Contract

It is undisputed that the RAE is a contract and that Auffarth signed it with an understanding that she was obligated to make the First Payment within six months of the effective date and the Second Payment within 25 months. *See* Auffarth Dep. 34:21-36:12.

### 2. Nationwide's Performance

Under the RAE, Nationwide promised to "extend to [Auffarth] the opportunity to service the[] policies that were serviced by the former agency of Graham/Siejack." RAE, Preamble. Auffarth,

---

[16] The parties agree that under Article 13 of the RAE, Ohio law governs this dispute.

for the first time in her cross-motion,[17] contends that Nation-
wide only allowed her to service the Graham policies.  In
support of this argument, she relies on a July 18, 2008 email
from Nationwide employee Tricia Caw, which states that "Auffarth
received the K. Graham book . . . [and] that is her only book."
Auffarth Opp., Ex. 12.  As Nationwide notes, this argument is
contradicted by Auffarth's answers to interrogatories,
deposition, and other parts of her cross-motion for summary
judgment.  *See Barwick v. Celotex Corp.*, 736 F.2d 946, 959-60
(4th Cir. 1984) (nonmoving party cannot create an issue of fact
by making contradictory statements).  In Answer to Interrogatory
No. 2, Auffarth stated that she "picked up" the Siejack files on
December 30, 2004.[18]  *Id.*  Her Answer to Interrogatory No. 7 notes
that the Graham book represented only "one-third of the book of
business assigned . . . by Nationwide."  *Id.*  In her deposition,
Auffarth testified that she had received "two books of business"
that were "merged together" and that the Graham book was "one of
the books [she] took over." Auffarth Dep. 32:11-1, 33:10.

---

[17] Auffarth did not mention Nationwide's failure to deliver the
Siejack book in her complaint or her answer to Interrogatory No.
3, which stated the factual bases for her contentions that
Nationwide "breached an obligation to [her] under the RAE."  She
may not amend her complaint by way of an interrogatory answer.
*See, e.g.*, *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468
F. Supp. 2d 489, 496 (W.D.N.Y. 2007).

[18] The Graham files were delivered to her on January 3, 2004.

Finally, in the same brief in which she asserts that she did *not* receive the Siejack policies, Auffarth states that she "was assigned the books of business of Beth Graham and Richard Siejack effective April 1, 2005." Auffarth Opp. 37 n.7.

The Caw email is, at most, a scintilla of evidence that Nationwide failed to assign Auffarth the Siejack policies, which, furthermore, is contradicted by Auffarth's own statements. This is not sufficient to create an issue of material fact as to whether Nationwide performed its obligations under the RAE. *See Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997).

### 3. Auffarth's Breach

It is undisputed that Auffarth has not paid Nationwide for the assigned policies, and the time for payment has passed. Nationwide argues that by failing to pay, Auffarth breached the contract. Auffarth counters that Nationwide waived its right to payment and is in breach for deductions from her commissions.

Auffarth argues that the events surrounding her transition to independent contractor indicate that Nationwide waived the amounts due under the RAE. She cites (1) her conversations with "Joy" or "Julie" and Dippel, in which she was told that she had "no outstanding balance" and that all obligations under the RAE had been satisfied; (2) the spreadsheet that indicates her

"Total Loan Balance" was zero; (3) the independent audit, during which her failure to pay was not raised; (4) and the email notice to all agents that she had successfully completed the RAE program and would be transitioned to Independent Contractor. She contends that these facts establish that Nationwide "made the decision to reduce the amount of monies owed underneath the RAE to zero." Auffarth Opp. 7. Auffarth also suggests that Nationwide decided to waive its right to payment to atone for for non-renewing important commercial policies and undervaluing the assignments.

Nationwide counters by citing the RAE's provision that "[n]o term or provision[] . . . shall be deemed waived and no breach excused unless such waiver or consent *shall be in writing and signed by the party claimed to have waived or consented*." RAE, Art. 15 (emphasis added). Auffarth's response to this argument is unclear. She has no evidence of a written waiver; nor does she contend that she qualified for one of the waiver options under Article 6. Her argument appears to be that the RAE was terminated when she was changed to an Independent Contractor. The RAE states that it will "continue until [Auffarth] [has] satisfie[d] the Second Payment," which it is undisputed Auffarth has not made. Termination of the RAE would not have relieved her of the obligation to pay for the

17

assignments because, under Article 2 of the RAE, "[e]xcept as
otherwise indicated . . . , in the event of cancellation or
termination of [the RAE] . . . [Auffarth] remain[ed] responsible
for any financial obligation [she] incurred in relation to [the
RAE]."  Auffarth cites no provision of the RAE that supports her
argument that her payment obligations did not survive her change
to Independent Contractor.

As for Auffarth's argument that Nationwide waived payment
to atone for its non-renewals of valuable commercial policy, she
has conceded in her deposition that although Nationwide
attempted to non-renew several policies, it was unsuccessful.
She has no evidence of a company non-renewed policy.

Auffarth's argument about the undervaluation of the
assignments in the RAE is unclear, but appears to be that during
the period between Graham and Siejack's retirements (around late
2004) and the date the policies were assigned to her (April
2005), the value of the Graham and Siejack "books" was
diminished because customers contracted with other agents.  Her
argument that this somehow voids the contract fails because the
RAE--which was not signed until June 2005--states that
"[Auffarth] and Nationwide *expressly agree* that the value of
assigning these policies to [Auffarth] is one hundred fifty
percent (150%) of the Income," which, the RAE stated, was

$276,940.  Arts. 2, 5 (emphasis added).  By signing the contract, Auffarth "expressly agreed" that the value of the assignments was $276,940.

Auffarth also argues that the amounts of the payments stated in the RAE were not final, but were subject to renegotiation.  Her argument appears to be that because Nationwide rejected her attempt to renegotiate the purchase price, it materially breached the contract, thus relieving her of her duty to perform.  In her answer to Interrogatory No. 7, Auffarth explained that because "there were considerable and unresolved problems with the valuation of the businesses that [she was purchasing] . . . [and] she was told repeatedly by Nationwide before she signed the agreement and for several months afterward that Nationwide would work with her on the valuation."  Ans. to Interrog. No. 7.[19]

Even assuming that Nationwide made such assurances, they are made irrelevant to whether the contract was breached by the parol evidence rule, which limits a completely integrated

---

[19] When asked about whether there are additional terms to the RAE that were not stated in the document, she did not mention these assurances, but only stated that the "understanding orally was that Nationwide works with you as you go through th[e] process of transitioning and taking over an agency."  Auffarth Dep. 31:19-21.

agreement to its "four corners."  The Court of Appeals of Ohio

recently explained that:

> The parol evidence rule is a rule of substantive law
> which, when applicable, defines the limits of a
> contract . . . . Where parties, following
> negotiations, make mutual promises which thereafter
> are integrated into an unambiguous written contract,
> duly signed by them, the parol evidence rule excludes
> from consideration evidence as to other oral promises
> resulting from such negotiations.

*Garland v. Simon-Seymour*, 2009 Ohio App. LEXIS 4854, at *13

(Ohio Ct. App. Oct. 30, 2009) (internal citations omitted).  "A

contract that appears to be a complete and unambiguous statement

of the parties' contractual intent is presumed to be an

integrated writing."  *Id*.  Thus, "[w]hether a contract is

integrated . . . is not dependent upon the existence of an

integration clause to that effect."  *Id*. at *14.

Although the RAE does not contain an integration clause, it

is a complete and unambiguous statement of the parties' intent.

The terms could be not clearer: the RAE states that Nationwide

will assign the Graham and Siejack policies in exchange for

$276,940.00, and the parties "expressly agree[d]" that this

amount represented the value of the policies.  Further, the RAE

detailed the ways in which the purchase price could be reduced,

and none of these provisions was triggered.  There is no

evidence that the RAE was anything other than a complete

statement of the parties' agreement about the assignment of the

20

policies.  The RAE is a completely integrated contract, and the oral agreements Auffarth cites are barred by the parol evidence rule.

Auffarth has not shown a genuine issue of material fact about whether she breached the contract or whether her obligation under the RAE was waived.

### 4. Damages

It is undisputed that Auffarth has not paid Nationwide for the assignments; thus, Nationwide has suffered damage as a result of Auffarth's breach of the RAE.  At her deposition, Auffarth conceded that she owed Nationwide "around a hundred thousand dollars."  *See* Auffarth Dep. 91:4-12.  The remainder of the contract price appears to have been recouped by Nationwide's commission deductions.  *See id*. 91:10; Nationwide Mot. Summ. J. 2 ("There remains owing to Nationwide approximately $122,000 which Auffarth has refused to pay.").  Because it is undisputed that Nationwide has suffered damages, and there is no genuine dispute of material fact as to the other elements required for breach of contract, Nationwide is entitled to summary judgment on the issue of Auffarth's liability.

Notwithstanding the parties' apparent agreement that Auffarth owes around $100,000 under the contract, Nationwide seeks summary judgment on its counterclaim, which demands "no .

. . less than $500,000.00, plus interest." *See* Paper No. 11.

There is no support in the record for this damage award.

Indeed, neither party has briefed the issue of Nationwide's

damages. Thus, although Nationwide is entitled to summary

judgment on the issue of liability,[20] the Court is unable to

award damages on the basis of this record. The parties will be

directed to submit a proposed briefing schedule for the issue of

damages within 14 days of the date of this Memorandum Opinion

and Order.

III. Conclusion

For the reasons stated above, Nationwide's motion for

summary judgment on Auffarth's claims will granted, and its

motion for summary judgment on its counterclaim will be granted

in part. Auffarth's motions for summary judgment and for leave

to file a supplemental memorandum will be denied.


June 30, 2010                    _____/s/_____
Date                             William D. Quarles, Jr.
                                 United States District Judge

---

[20] Because the Court concludes that Nationwide is entitled to
summary judgment on its counterclaim, Auffarth's cross-motion on
the counterclaim will be denied.