IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|   |   |
|---|---|
| DAWN M. AUFFARTH, | * |
| Plaintiff, | * |
| v. | * CIVIL NO.: WDQ-08-1399 |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Dawn M. Auffarth sued Nationwide Mutual Insurance Company ("Nationwide") for a declaratory judgment, breach of contract, and other claims. Nationwide counterclaimed for breach of contract. For the following reasons, Auffarth's motions for leave to file a surreply and sealed exhibits will be granted, and Nationwide's motion for summary judgment as to damages will be denied.

I.  Background[1]

Auffarth is a Nationwide insurance agent in Phoenix, Maryland. ECF No. 55, Ex. 10. On April 1, 2005, she entered into a "Replacement Agency Executive Performance Agreement" (the "RAE") with Nationwide, under which Nationwide assigned her the

---

[1] On summary judgment, Auffarth's evidence "is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

rights to service policies of its retiring agents Beth Graham
and Richard Seijack. ECF No. 51, Ex. 1 [hereinafter "RAE"].[2]

Auffarth was to pay Nationwide $276,940.00 for the
servicing rights. RAE Arts. 2,3,5,7. The payment was to be in
two installments: a "First Payment" of $184,627 was due "within
ten (10) days following the six (6) month anniversary of the
effective date of [the RAE]," *i.e.*, October 10, 2005;[3] and a
"Second Payment" of $92,313 was due "by the end of the 25th full
calendar month following the effective date of [the RAE]," *i.e.*,
May 31, 2007. *Id.*, Art. 5.

Auffarth could rescind the RAE, and avoid all payment
obligations, by notifying Nationwide within six months of the
effective date. *Id.* The purchase price for the servicing
rights could also be adjusted two ways: (1) under Article 5,
"[p]ayment amounts . . . [could] be adjusted and reduced if,
during the first twelve (12) months following the effective date
of th[e] Agreement, 5% or more of the direct written premiums .
. . from the Nationwide commercial lines policies assigned to
[Auffarth] . . . [was] nonrenewed by Nationwide," or (2) under
Article 6, "[u]p to one hundred percent (100%) of the Second
Payment [could] be waived by Nationwide if certain requirements

---

[2]  The RAE states that it is governed by Ohio law. RAE Art. 13.
[3]  The effective date of the RAE was April 1, 2005. RAE Art. 2.

[were] met" by Auffarth. *Id.*, Arts. 5, 6. The RAE required that all waivers be "in writing and signed by the party claimed to have waived." *Id.*, Art. 15.

The RAE also stated that it would "continue until [Auffarth] satisfie[d] the Second Payment" and that "[e]xcept as otherwise indicated . . . , in the event of cancellation or termination of [the RAE] . . . [Auffarth] remain[ed] responsible for any financial obligation [she] incurred in relation to [the RAE]." *Id.*, Art. 2. Finally, the RAE stated that "[i]n addition to all other remedies that it may pursue Nationwide shall have the right to recapture any amount due to [it] from any future compensation due to [Auffarth]." *Id.*, Art. 12.

On October 10, 2005—the due date for the First Payment—a Nationwide representative emailed Auffarth that it was "time for [her] to decide if [she] wanted to purchase the servicing rights," which could be done by obtaining financing through the Nationwide Federal Credit Union ("NFCU") or through outside financing. ECF No. 51, Ex. 5. The email instructed Auffarth that if she obtained outside financing she should "remit the first payment [of $184,627] in full to Nationwide Insurance" or she could reply within five days of the email that she did not want to retain the servicing rights." *Id.* The email warned that "[i]f the loan documents [for NFCU financing] are not secured or payment is not remitted within 45 days of this

3

reminder, all future commission payments will be withheld and applied to the outstanding amounts due." *Id.* Auffarth planned to obtain NFCU financing and had reached an agreement—in principle—on a 12-year, 144-payment loan in the amount of the First Payment. *See* Auffarth Ans. To Interrog. No. 7, Jan. 29, 2009.

On October 7, 2005, Nationwide emailed Auffarth that it planned to "non-renew"[4] a valuable commercial policy she had been servicing. ECF No. 55, Ex. 21. Because Auffarth stood to lose significant premiums from this account, she emailed Nationwide Sales Manager Teresa Dippel to request that the price of the assignments under the RAE be reduced. *Id.*, Ex. 28. In her email to Dippel, Auffarth stated that the "[s]ignature for [her] loan [was] due," and she wanted "an email confirming . . . adjustments to the overall purchase price." *Id.* On October 21, 2005, Auffarth learned that Nationwide planned to non-renew a second valuable commercial policy. *Id.*, Ex. 26-A.

Because of her uncertainty about the commercial policies, Auffarth did not sign the NFCU loan documents and instead awaited Nationwide's decision on her request to adjust the purchase price of the RAE because of the anticipated non-

---

[4] Nationwide could decide not to renew expired policies of commercial clients, and Auffarth would not collect premiums of those "non-renewals" she had been assigned. *See* ECF No. 69 at 3.

4

renewals. Auffarth Ans. to Interrog. No. 7. After Nationwide was unsuccessful in its attempts to non-renew the commercial policies,[5] Dippel informed Auffarth on March 13, 2006, that it would not adjust the RAE's purchase price. *Id.*, Ex. 23. Auffarth did not make the required payments or sign the loan documents. *See id.*, Ex. 29.

Despite her continuing failure to pay under the RAE, in June 2007, Nationwide announced that Auffarth had transitioned from a Replacement Agency Executive to a full-fledged Independent Contractor. *Id.*, Ex. 10. The email announcing this change stated that Auffarth had "completed [the] RAE program." *Id.*

Around this time, Auffarth called Nationwide's Agency Development Department to ensure that everything was in order for her change to Independent Contractor. Dawn M. Auffarth Dep. 97:20-98:13. She spoke with a person named "Joy" or "Julie" who told her there was no "outstanding balance" under the RAE. *Id.* 98:10-13. Shortly thereafter, Auffarth spoke to Dippel, who also stated that "she [had] looked at the sheets," there was no "outstanding balance," and Auffarth had successfully completed the RAE program. *Id.* 98:14-25. In stating that there was no outstanding balance, Dippel and "Joy" or "Julie" for Agency

---

[5] Nationwide's attempts to non-renew the policies were blocked by the Maryland Insurance Commission. *See* ECF No. 55, Ex 23.

Development apparently had referred to a May 2007 spreadsheet, which stated that Auffarth's "Total Loaned Amount" was $276,940.30 (*i.e.,* the RAE purchase price) and her "Total Loan Balance" was zero. *See* ECF No. 55, Ex. 4.

In late August or early September 2007, Dippel called Auffarth about her failure to pay Nationwide. Auffarth Dep. 103:10-21. She told Auffarth that Agency Development had "screwed up," and a number of people had failed to pay amounts due under agreements similar to the RAE. *Id.* 104:1-10. Dippel explained that Nationwide would issue a letter demanding repayment within 30 days, and Auffarth said she would pay "whatever [she was] legally obligated to pay." *Id.* 104:1-105:22. No payment followed.

In April 2008, Nationwide sent Auffarth a "final notice" of her "unfunded RAE commitment." ECF No. 51, Ex. 6. The final notice stated that Auffarth had a $276,941 balance due, but Nationwide "elected not to pursue past due interest back to the date of when the initial payments were required." *Id.* The notice stated that if the full balance was not paid by May 1, 2008, Nationwide would "exercise its rights to initiate a 3 year (72 installment) commission deduction plan to obtain payment . . . pursuant to the terms of [the RAE]." *Id.* Each deduction would be "in the amount of $4,269.99" and would include "an ongoing servicing fee." *Id.* A commission deduction schedule

was attached to the letter, which showed that over the course of 72 bi-weekly commission deductions, Auffarth would pay a total servicing fee of $30,498.01. ECF No. 55, Ex. 1; Tricia Claw Aff. ¶ 6. Auffarth did not pay the full remaining balance, and on or about April 15, 2008, Nationwide began commission deductions. Tricia Claw Aff. ¶ 4.

On May 21, 2008, Auffarth sued Nationwide in the Circuit Court for Baltimore City for a declaratory judgment, breach of contract, tortious interference, unfair competition, misrepresentation, negligent misrepresentation, breach of fiduciary duty, negligent advice, and unjust enrichment. ECF No. 2. On May 30, 2008, Nationwide removed to this Court, and counterclaimed for breach of contract. ECF Nos. 1, 11.

On September 8, 2008, Auffarth mailed a check to Nationwide for $150,000, "to be applied to [her] alleged outstanding balance." ECF No. 81, Ex. 4. Nationwide Manager Jennifer L. Rozanski received the check and emailed Auffarth on September 19, 2008 that she must "work directly with Nationwide's counsel in regards to this matter" because she was represented by counsel. *Id.* Nationwide never cashed the $150,000 check. *See* Tricia Claw Aff.

Also on September 19, 2008, this Court dismissed all but Auffarth's claims for declaratory judgment and breach of contract. ECF No. 28. On June 30, 2010, the Court granted

7

Nationwide summary judgment on those claims, and on Auffarth's liability for its counterclaim. ECF No. 69. The Court ordered the parties to submit additional briefs on damages because Nationwide had not briefed damages in its motion. *Id.*

On August 23, 2010, Nationwide filed its brief in support of damages, to which Auffarth responded on September 13, 2010. ECF Nos. 73 & 74. After Nationwide filed its reply brief in support of damages, Auffarth moved to file a surreply on October 5, 2010, which Nationwide has opposed. ECF Nos. 76, 77, 78. On September 13, 2010 and November 8, 2010, Auffarth also filed motions for leave to file exhibits under seal. ECF Nos. 75, 80. However, she did not file those exhibits with the Court until December 23, 2010. ECF Nos. 81, 82.

II. Analysis

    A.    Standard of Review

Because the parties agree that their damages briefs are essentially a continuation of Nationwide's motion for summary judgment, the Court will apply Rule 56 (a).[6] *See* ECF No. 76 at 2; ECF No. 77 at 1.

---

[6] Summary judgment may be granted on damages when there is no genuine issue as to the amount of damages and the aggrieved party is entitled to judgment as a matter of law. *Reedy River Ventures, LP v. Synoptics Commc'ns, Inc.*, 38 F.3d 1213, 1213 (4th Cir. 1994).

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but it also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B.   Auffarth's Motion for Leave to File a Surreply

Auffarth has moved for leave file a surreply to Nationwide's reply brief in support of damages. ECF No. 77. She argues that a surreply is needed because Nationwide

addressed issues of Ohio law for the first time in its reply. *Id.* at 1.

Unless otherwise ordered by the court, a party generally may not file a surreply. Local Rule 105.2 (a) (D. Md. 2011). Leave to file a suprreply may be granted when the movant otherwise would be unable to contest matters presented for the first time in the opposing party's reply. *Khoury v. Meserve,* 268 F. Supp. 2d 600, 605 (D. Md. 2003). Because Nationwide raised issues of Ohio law for the first time in its reply, and Auffarth had not addressed some of these issues in her opposition, her motion for leave to file a surreply will be granted. *See id.* The Court has considered the surreply.

C.  Nationwide's Motion for Summary Judgment on Damages

In the June 30, 2010 Memorandum Opinion, this Court held that Nationwide was entitled to summary judgment that Auffarth had breached the RAE because: (1) it was undisputed that the RAE was a contract between the parties, (2) there was no genuine dispute that Nationwide had performed its obligations under the RAE, and (3) Auffarth had not shown a genuine dispute "whether she breached the contract or whether her obligation under the RAE was waived." ECF No. 69. The Court also explained that although it was undisputed that Nationwide had suffered damages, "[t]here was no support in the record for [its requested $500,000] damage award." *Id.*

Nationwide now argues that it is undisputed that Auffarth's breach entitled it to recover: (1) the full principal due under the RAE,[7] and (2) "prejudgment interest in the form of the . . . servicing fee payments." ECF No. 73 at 3. It contends that this entitles it to a judgment of $307,438.01,[8] less any amounts already collected. *Id.*; ECF No. 76 at 1. Auffarth argues that Nationwide has incorrectly relied on Maryland law, and under Ohio law no servicing fee or prejudgment interest should be awarded. ECF No. 74 at 1-2.

1. Choice of Law

The RAE states that "it shall be deemed to have been made under and governed by the laws of the State of Ohio without regard to Ohio's choice of law rules." RAE Art. 13. Based on this provision, Auffarth argues that Ohio law should govern damages; Nationwide contends that Maryland law applies. *See* ECF Nos. 73 & 74.

---

[7] This Court has already held that Nationwide is entitled to recover the full RAE purchase price of $276,940 from Auffarth. *See* ECF No. 69 at 14, 16, 21 ("It is undisputed that the RAE is a contract and that Auffarth signed it with an understanding that she was obligated to make the First Payment . . . and Second Payment"; "It is undisputed that Auffarth has not paid Nationwide for the assignments.").

[8] This is the full RAE purchase price of $276,940 and a $30,498.01 servicing fee.

In a diversity action, the forum state's choice-of-law rules determine the applicable substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817 (1938). Maryland courts apply the doctrine of *lex loci contractus* to contract claims unless the parties have agreed that another state's law will govern. *See Padco Advisors, Inc. v. Omdahl,* 179 F. Supp. 2d 600, 605 (D. Md. 2002).

"Maryland honors choice of law clauses in contracts, generally," and that rule extends to damages issues arising from a contractual breach. *Marine Midland Bank v. Kilbane,* 573 F. Supp. 469, 471 (D. Md. 1983) *aff'd* 739 F.2d 958 (4th Cir. 1984). Accordingly, because the RAE is governed by Ohio law, Ohio law governs the award of damages.[9]

2. Prejudgment Interest

Nationwide argues that it is entitled to recover the principal balance due under the RAE, and the full servicing fee. ECF No. 73 at 2. It argues that the servicing fee is like an agreed-upon rate of prejudgment interest and was "intended to compensate Nationwide for the loss of use of the full principal which was past due." *Id.* Auffarth contends that because she

---

[9] *Kilbane,* 573 F. Supp. at 471 (D. Md. 1983) (New York law applied to determine prejudgment interest when the parties agreed that New York law governed their contract).

never agreed to the servicing fee, Nationwide is not entitled to that fee or prejudgment interest. ECF No. 74 at 11.

Under Ohio law, when liability for breach of contract has been established, "the trial court does not have discretion in awarding prejudgment interest." *Fiorilli Constr., Inc. v. A. Bonamase Contracting, Inc.*, 2011 WL 198662, at *7 (Ohio App. 8th Dist. Jan. 13, 2011). Rather, Ohio statutes provide that "when money becomes due and payable upon any . . . instrument of writing [or] verbal contracts entered into . . . the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money." R.C. § 1343.03 (A). Accordingly, as a matter of law, Nationwide is entitled to prejudgment interest on the RAE. *Fiorilli*, 2011 WL 198662 at *7; *Horning-Wright Co. v. Great Am. Ins. Co.*, 27 Ohio App. 3d 261, 263-64, 500 N.E.2d 890 (Ohio App. 9th Dist. 1985). The questions are (1) when did that interest begin to accrue, and (2) what rate applies.

      a.    Date Money Became Due and Payable

Prejudgment interest should be awarded from the time the amount at issue becomes "due and payable," and Ohio courts have "consistently . . . held" that money only becomes "due and payable" under a contract when "the amount owed . . . is clear and certain" or "capable of mathematical calculation by

13

application of a formula." *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 163, 172 583 N. 1056 (Ohio App. 1st Dist. 1990). The accrual of interest is not delayed because the debtor denies the debt. *Id.*

Here—although the First Payment was due under the RAE on October 10, 2005—the amount of the First Payment was not certain until Nationwide told Auffarth on March 13, 2006 that it would not amend the RAE's purchase price, a request she made in accordance with the terms of the RAE.[10] Thus, on March 13, 2006, the amount of the First Payment—$184,627—became due and payable; that amount is subject to prejudgment interest beginning then. Also, it is undisputed that the Second Payment of $92,313 was due on May 31, 2007. Accordingly, prejudgment interest on the $92,313 will be calculated from that date.

b. Rate of Interest

The question remains what rate should be applied. Nationwide contends that the servicing fee stated in the commission deduction schedule is a contractual rate of prejudgment interest and should be applied. ECF No. 76 at 7. Although "[c]ourts routinely interpret . . . 'service charge' language as establishing a contractual rate of prejudgment

---

[10] *See Horning-Wright*, 27 Ohio App. 3d at 263-64 (amount due is not clear and certain if there remains a dispute over the amount of liability, rather than merely a dispute over liability itself).

14

interest that supersedes the statutory rate," *Amerisource Corp. v. Rx USA Int'l, Inc.*, 2010 WL 2160017, at *5 (E.D.N.Y. May 26, 2010) (collecting cases), under Ohio law, entitlement to a prejudgment interest rate different than the statutory rate requires (1) "a written contract between the parties," that (2) "provide[s] a rate of interest with respect to money that becomes due and payable," *Yager Materials, Inc. v. Marietta Indus. Ent., Inc.*, 116 Ohio App. 3d 233, 235-236 (1996).

As Nationwide argues, the commission deduction schedule attached to the final notice provides a "rate of interest" for the money due and payable because the schedule states the interest to be charged, *i.e.*, the $30,498.01 servicing fee.[11] However, to show its entitlement to that fee, Nationwide must also demonstrate that the final notice—to which the commission deduction schedule was attached—was "a written contract between the parties" providing for that fee. *Yager*, 116 Ohio App. 3d at 236.[12] Merely "stat[ing an amount due] on an invoice or bill

---

[11] *See Hobart Bros. Co. v. Welding Supply Serv., Inc.*, 21 Ohio App. 3d 142, 144, 486 N.E.2d 1229 (Ohio App. 10th Dist. 1985) ("The term 'rate of interest' as used in R.C. 1343.03 (A) refers to the percentage or amount of interest. When . . . the contract merely states that interest will be charged without specifying the percentage or amount of interest to be charged, the contract does not meet the requirement of R.C. 1343.03 (A).").

[12] The RAE cannot be a contract providing for a non-statutory rate of interest because it states only that "[i]n addition to all other remedies that it may pursue, Nationwide shall have the

does not meet the requirement." *Id.* Nationwide must prove Auffarth's assent to the servicing fee. *Id.*

Assent may be express or implied "by the surrounding circumstances." *Legros v. Tarr,* 44 Ohio St.3d 1, 6-7, 540 N.E.2d 257 (Ohio 1989). Implied assent is "a question of fact to be resolved by the trier of fact," who must "determine whether an intent to be bound can be rightfully inferred from the conduct and statements of the parties." *AO Freight Corp. v. Snyder Comp. Sys., Inc.,* 2010 WL 3836124, at *5 (Ohio App. 7th Dist. Sept. 24, 2010). This Court cannot enter summary judgment on damages if Auffarth has presented evidence of a genuine dispute about her assent to the servicing fee. *Id.*

Nationwide argues that Auffarth impliedly assented to the fee because after she received the final notice she did not pay the full principal balance, and instead "elected" the commission deductions plus servicing fee. As Auffarth argues, it is undisputed that Nationwide controlled the commission deductions, and Auffarth sued Nationwide for breach of contract about a month after she received the final notice. From this, a reasonable factfinder could conclude that Auffarth's failure to pay the full balance in accordance with the final notice was not

---

right to recapture any amount due to [it] from any future compensation due to [Auffarth]." RAE Art. 12. The RAE is silent as to any interest or service charge on the recaptured amounts. *See* R.C. 1343.03 (A).

16

implied assent to the commission deduction and servicing fee.[13]
Auffarth has shown a genuine dispute about the existence of a
contract providing a rate of interest different than Ohio's
statutory one, and summary judgment cannot be granted on
damages. Accordingly, Nationwide's motion will be denied.

  c. Other Considerations

The parties make a number of other arguments about damages
that the Court cannot resolve until the issue of Auffarth's
assent to the servicing fee is resolved.[14] This Memorandum
Opinion is without prejudice to the parties' ability to raise
damages arguments not addressed here after resolution of the
servicing fee issue.

---

[13] *See The Scotts Co. v. Central Garden & Pet Co.*, 256 F. Supp. 2d 734, (S.D. Ohio 2003)(when one party "mere[ly] send[s] an invoice . . . after at least part performance, which unilaterally references a higher rate of interest than that imposed by Ohio law" it is not a written contract providing a different rate of interest); *Cuff's, Inc. v. Clemmons*, 1994 WL 568320, at *1-2 (Ohio App. 8th Dist. Oct. 13, 1994)(plaintiff did not show defendant's implied assent to interest rate greater than the statutory one when the only evidence of assent was that the defendant made some payments "on an overdue account charging interest at . . . a rate higher than that provided [by statute]").

[14] For example, until the Court is able to determine what rate of prejudgment interest applies, it cannot compute how each commission deduction—which included the possibly improper servicing fee—should offset the remaining principal balance on which prejudgment interest may continue to accrue.
17

III. Conclusion

For the reasons stated above, Auffarth's motion for leave to file a surreply will be granted, and Nationwide's motion for summary judgment on damages will be denied. Auffarth's unopposed motions for leave to file exhibits under seal will also be granted.[15]

| | |
|---|---|
| _8/29/11_ <br> Date | _/s/ William D. Quarles, Jr._ <br> William D. Quarles, Jr. <br> United States District Judge |

---

[15] The exhibits are within the parties' "Stipulated Order Regarding Confidentiality of Discovery Materials." ECF No. 23.